```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2

 3   UNITED STATES OF AMERICA,)   Case No.
                              )   04-80102-CR-MIDDLEBROOKS
 4            Plaintiff,       )
                              )
 5        -v-                 )
                              )
 6   MICHAEL CRAPE,           )
                              )
 7            Defendant.      )   West Palm Beach, Florida
                              )   May 7, 2009
 8   _____)   1:30 p.m.

 9

10                         PAGES 1 - 32

11            TRANSCRIPT OF REVOCATION PROCEEDINGS

12        BEFORE THE HONORABLE DONALD M. MIDDLEBROOKS

13                     U.S. DISTRICT JUDGE

14

15

16   Appearances:

17

     For the Government:       WILLIAM T. ZLOCH
18                             Assistant United States Attorney
                               500 Australian Avenue, Suite 400
19                             West Palm Beach, Florida  33401

20   For the Defendant:        ROBIN ROSEN-EVANS
                               Assistant Federal Public Defender
21                             450 Australian Avenue, Suite 500
                               West Palm Beach, Florida  33401
22

23
     Reporter:                 Karl Shires, RPR
24   (561) 514-3728            Official Court Reporter
                               701 Clematis Street, Suite 258
25                             West Palm Beach, Florida  33401
```

STENOGRAPHICALLY RECORDED COMPUTER-AIDED TRANSCRIPT

1            THE COURT:  Good afternoon.  Please be seated.

2            This is the case of the United States versus

3  Michael Crape, Case No. 04-80102.

4            Could we please have appearances?

5            MR. ZLOCH:  Good afternoon, your Honor.  Bill Zloch

6  representing the United States.  With me at counsel table is

7  US Probation Officer Heath Schur.

8            THE COURT:  Good afternoon.

9            MS. ROSEN-EVANS:  Good afternoon, your Honor.

10  Robin Rosen-Evans on behalf of Mr. Crape who is to my right.

11            THE COURT:  Good afternoon.

12            Okay.  I've reviewed a number of documents that

13  were filed; the parties stipulation as to procedural history

14  and its attachments, the defendant's memorandum of law in

15  support of position that mental status is a complete defense

16  to the allegation he violated conditional release, and the

17  Government's response.

18            Are there any other filings?

19            MR. ZLOCH:  No, your Honor.

20            THE COURT:  Okay.  Mr. Zloch what do you plan to do

21  today?

22            MR. ZLOCH:  Your Honor, I think the parties have

23  worked hard to try to really focus the issue before the

24  Court, and I would submit that the issue to be decided today

25  is whether or not Mr. Crape violated his conditional release.

```
 1   And if so, the Government would be moving this Court to
 2   revoke his conditional release and commit the defendant to
 3   the custody of the Attorney General.
 4          THE COURT:  And what -- do you plan to put on a
 5   witness or witnesses?
 6          MR. ZLOCH:  Your Honor, if I may approach the
 7   lecturn?
 8          THE COURT:  Sure.  Either way.  As long as you can
 9   be heard you can stay where you were or do it there.
10          MR. ZLOCH:  Okay, your Honor.  Judge, by way of
11   background, on April 5th, 2005, this Court entered a
12   conditional release order as to this defendant.  That --
13          THE COURT:  I remember most of the background.
14          MR. ZLOCH:  Okay, your Honor.
15          THE COURT:  Are you going to call a witness or --
16   I'm just trying to figure out procedurally what you plan to
17   do.  I understand that he's accused of writing some letters.
18          MR. ZLOCH:  There are two --
19          THE COURT:  I don't know if there's much debate
20   over that, whether they were sent or not -- whether they were
21   sent.  Ms. Rosen-Evans seems to suggest that if he was
22   incompetent and was not competent at the time he sent the
23   letters, that that's a defense to the allegation you make.
24   Isn't that your argument?
25          MS. ROSEN-EVANS:  Well, Judge, we're talking about
```

1   competency and sanity.  They're two different things.

2           THE COURT:  Well, if he was not --

3           MS. ROSEN-EVANS:  If he was insane, he wasn't

4   legally responsible.  I think that's one of the issues.  I

5   also have a presentation I would like to -- maybe we can

6   streamline this and I can tell the Court what I think the

7   issues are also.

8           THE COURT:  So you all want to just tell me what

9   you think the issues are first?

10          MS. ROSEN-EVANS:  I think that would help, and then

11  I don't know that there is going to be any presentation of

12  testimony.  There will probably just be argument.

13          THE COURT:  Okay.  Although I thought that's what

14  your written submissions did.  If there's something you have

15  to tell me in addition to those --

16          MS. ROSEN-EVANS:  Well, I would just like to make

17  one other --

18          THE COURT:  Okay.  Go ahead, Mr. Zloch, and then

19  we'll hear from Ms. Rosen-Evans.

20          MR. ZLOCH:  It may be productive if Ms. Rosen-Evans

21  wants to announce her position, and then we can respond to

22  it.

23          THE COURT:  All right.

24          MS. ROSEN-EVANS:  Just briefly, your Honor,

25  since -- I think that we are all in agreement to the

1  procedural history involved.  We have presented it to the

2  Court, and we've attached all of the documents.

3          It's my position, your Honor -- two things.  The

4  first is that the violation petition does not allege a

5  failure to comply with the prescribed treatment regiment

6  which under the statute is the whole vehicle to get Mr. Crape

7  before the Court.  There has to be an allegation that he

8  failed to comply with the prescribed treatment regiment.  So

9  it would be my position, your Honor, that the conduct alleged

10  in the petition is not connected to compliance or

11  noncompliance with the treatment regiment and, therefore, to

12  violate him based upon the allegations in the petition would

13  be a misapplication of the statute.  That's a legal argument.

14  It's not factual argument, your Honor.

15          It's also my position that there is a lack of

16  evidence that he failed to comply with the treatment

17  regiment.  In the Government's last pleading there is a

18  paragraph where the prosecutor indicates that he and the

19  probation officer had spoken to the administrator of Golden

20  Years, which is the ALF where Mr. Crape was living at the

21  time he wrote the letters.  And according to the

22  administrator, Mr. Gold, it would seem that Mr. Crape was

23  given his medications.  So that's the first issue.  I

24  believe -- again, that's a legal issue.  It's not a factual

25  issue.

| | |
|---|---|
| 1 | THE COURT:  Well, let me understand your first one. |
| 2 | Wasn't it a condition that he not mail, distribute, or |
| 3 | transmit any threatening communications? |
| 4 | MS. ROSEN-EVANS:  I'm getting to that. |
| 5 | THE COURT:  I thought your first argument was that |
| 6 | the petition didn't go to a condition of release? |
| 7 | MS. ROSEN-EVANS:  No, it didn't go to a failure to |
| 8 | follow the treatment regiment. |
| 9 | THE COURT:  I don't understand that.  Why is this |
| 10 | any different than any other conditional release?  Why isn't |
| 11 | a violation of the requirement that he not mail, distribute, |
| 12 | or transmit any threatening communication sufficient? |
| 13 | MS. ROSEN-EVANS:  Then it would be my position that |
| 14 | you would have to make a factual finding that that condition |
| 15 | was part of his treatment of regiment.  And my position is it |
| 16 | is not part of his treatment regiment.  It may be another |
| 17 | condition that the Court imposed in condition -- in |
| 18 | conjunction with all of the treatment requirements, meaning |
| 19 | that he attend counseling, that he take his medications, |
| 20 | those types of things.  So again, that would be my position. |
| 21 | In addition to that, your Honor, if you do find |
| 22 | that the writing of the letters was, in fact, connected to |
| 23 | the treatment regiment, then I would argue that his conduct |
| 24 | as alleged in the petition was not willful or even |
| 25 | knowingly -- willfully or even knowingly committed. |

```
 1              The parties agree that based upon Dr. Bugas' report
 2     that Mr. Crape was legally insane when he wrote the letters.
 3     We would argue that it would violate due process to take a
 4     away a person's liberty for conduct he was incapable due to
 5     mental illness of understanding was wrong.
 6              Insanity has been --
 7              THE COURT:  Although, if you accept that argument,
 8     that means that anyone -- if you can ever get out, if you can
 9     become competent or sane enough to get out, once you do if
10     you relapse and become insane, you can never be sent back.
11     Basically that's your argument.
12              MS. ROSEN-EVANS:  Well, Judge, we have to separate
13     out sanity from competency.  If the person becomes
14     incompetent, I don't think that that is a violation of his
15     conditional release unless the incompetence poses a danger to
16     the person or property of others in the community.  I believe
17     that's the wording of the statute.
18              If somebody commits an act, a criminal act and they
19     are found to have been insane at the time the act was
20     committed, then I would argue that is not a willful violation
21     of the terms of the treatment regiment or the conditions of
22     his release.
23              THE COURT:  Well, what if he had killed somebody?
24     That would be just too bad?
25              MS. ROSEN-EVANS:  Well, Judge, if he's not legally
```

```
 1    responsible --

 2              THE COURT:  So you say you just leave him --

 3              MS. ROSEN-EVANS:  You treat him.

 4              THE COURT:  -- to continue to kill people?

 5              MS. ROSEN-EVANS:  No, you treat him.

 6              THE COURT:  Isn't that what this does?  If I find

 7    he violated conditional release, he goes back to the

 8    institution and presumably they treat him.

 9              MS. ROSEN-EVANS:  Well --

10              THE COURT:  It seems like your argument is you just

11    leave him in the community.

12              MS. ROSEN-EVANS:  You can leave him in the

13    community and treat him at the same time, your Honor.  I

14    don't think that they're mutually exclusive.

15              THE COURT:  You don't see a problem with that

16    argument?

17              MS. ROSEN-EVANS:  I think that you may not like

18    what the law is, but I don't think that changes the fact that

19    if somebody is not criminally responsible, then the next step

20    is whether or not that in and of itself is enough to violate

21    the treatment regiment or the conditions of release, and then

22    the next step after that is whether or not the person

23    presently is a danger to himself and the persons and property

24    of others in the community such that no conditions of release

25    would insure the safety of the community.
```

```
1              I mean, someone might be mentally ill, but you --

2    and may have done something like -- I'm not going to use

3    murder because I think that's the most extreme -- a crime,

4    but --

5              THE COURT:  Well, the crime here, he wrote a letter

6    to the sheriff saying he was going to kill people.  Isn't

7    that what he did?

8              MS. ROSEN-EVANS:  That's what the allegation is,

9    your Honor.  But all I'm saying is, first of all, you would

10   have to determine that it didn't matter what his mental state

11   was.  That's a legal issue, not a factual issue.

12             And number two, even if found that insanity was not

13   a defense, you would still have to find that there were no

14   conditions which would -- treatment conditions which would

15   assure the safety of persons and property in the community.

16             So my argument, number one, is that the petition

17   does not allege that he failed to comply with the treatment

18   regiment.  Number two --

19             THE COURT:  And why does it have to?

20             MS. ROSEN-EVANS:  Because the statute says that

21   the --

22             THE COURT:  Where -- it says that -- that's why

23   you're making a distinction between treatment regiment and

24   conditions of release?  Because my order when I released him

25   did say that he couldn't write anymore letters threatening to
```

```
 1   kill people.

 2           MS. ROSEN-EVANS:  Well, then my argument --

 3           THE COURT:  And so is the statute -- does the

 4   statute trump that in some fashion?  Is the statute limited

 5   so that once somebody is out, they can only go back if they

 6   fail to comply with a treatment regiment?

 7           MS. ROSEN-EVANS:  The cases that I have looked at,

 8   your Honor, and of course the prosecutor if he's found

 9   something different, they all use the phrase "failure to

10   comply with the treatment regiment."  So my argument is that

11   the conduct alleged does not allege that he failed to comply

12   with the treatment regiment.  And there is really no evidence

13   in the record that he did fail to comply.

14           So, then the next question becomes whether or not

15   that alone -- you're going to find that that is a part of the

16   treatment regiment.  I argue it's not.

17           THE COURT:  See, I don't know if it was a mistake

18   to let him out in the first place and the doctors were wrong,

19   whether the treatment that they were giving him was

20   inadequate, or whether he failed to comply with what they

21   told him to do.  But any of those three somehow -- one of

22   those three resulted in him continuing to write letters

23   saying if you don't do certain things, I'm going to kill

24   people.  Why do I need to even try to figure out which of the

25   three caused it?
```

1           MS. ROSEN-EVANS:  Well, I think you would need to

2     do that so that there's -- so that you comply with the

3     statute.  The statute says that you have to find that he

4     failed to comply with the treatment regiment.  So I guess you

5     can arrive at that conclusion in any way you feel

6     appropriate, but I'm just saying I think under the statute

7     you have to make that finding.  And then even if you make

8     that finding, you then have to determine whether or not he

9     presently is a danger.  And those are, I think, two separate

10    issues.

11          He has been in custody now for almost two years.

12    He's on his medications.  He's competent.  So you still -- I

13    would argue that there are conditions of release which would

14    insure the safety of the community and that you can release

15    him.

16          So I think there are two separate issues.  The

17    first issue is whether the petition is properly drafted, and

18    you have to make that conclusion.  And then you have to then

19    determine whether or not presently regardless of what you

20    find as to the violation, whether presently he is -- he fits

21    the criteria for commitment under the statute which means a

22    danger to himself or others of person and property in the

23    community.  I think that's the way it's worded.

24          THE COURT:  All right.  I think I understand your

25    position.

1          MR. ZLOCH:  Judge, I would begin by pointing out

2     that there is no argument or dispute between the parties that

3     Mr. Crape wrote the letter in question containing the threats

4     which brings him to Court.

5          THE COURT:  Well, she told me a moment ago that is

6     what he was alleged to have done.

7          MR. ZLOCH:  Well, if they want to reconsider that

8     position, because I was looking at the transcript from the

9     December 18th, 2007, hearing, and I can show a copy to

10    Ms. Rosen-Evans, but it is pretty clear that Ms. Rosen-Evans

11    agreed at that time that the letter had been authored by her

12    client.

13         MS. ROSEN-EVANS:  I'm not disputing that, Judge.

14    That's the allegation in the petition.

15         MR. ZLOCH:  All right.  Now that we've established

16    that the letter was, in fact, written by the defendant,

17    moving onto Ms. Rosen-Evans next argument that this Court --

18    or her argument that for this Court to find that he violated

19    his condition of release by writing the threatening letter

20    would be in contravention of the statute.

21         When this Court entered the conditional release

22    order back in April of 2005, which contained specific

23    conditions of Mr. Crape's release, Ms. Rosen-Evans never

24    appealed that order.  And I would submit to the Court that

25    her argument now has been waived by her inaction for failing

1     to appeal the order when it was initially entered.

2              So I would submit to the Court that this Court can

3     certainly use the prior order when determining whether or not

4     to revoke Mr. Crape's conditional release.  And it would be

5     perfectly -- there would be no violation of the statute if

6     the Court were to do so.

7              THE COURT:  Well, wasn't this an agreed order?  I

8     thought you all agreed to the order I entered after our

9     hearing.  Am I wrong about that?

10             MR. ZLOCH:  It's been a while, your Honor, but I --

11    Ms. Rosen-Evans never appealed this Court's order of

12    conditional release so her argument before the Court today I

13    think has been waived.  So I would submit --

14             THE COURT:  Is there an argument that I added

15    conditions that the statute doesn't permit?  Is there some

16    argument to that effect?

17             She seems to say that the only thing I can look at

18    is whether he abided by the prescribed regiment of care as

19    opposed to trying to decide whether he failed to follow the

20    conditions of release I set forth in the order.

21             MR. ZLOCH:  Your Honor, I would submit to the Court

22    that a conditional release may be revoked and the acquitee

23    recommitted to a mental hospital upon a finding that the

24    acquitee presents a danger to himself or others, and

25    revocation may also be based upon a finding that the acquitee

1  has failed to comply with the conditions of his release even

2  though such failure has been unintentional and even absent

3  any showing of dangerousness.

4       THE COURT:  What are you reading from?  Is that the

5  statute or the case you cited?

6       MR. ZLOCH:  Your Honor, this is from an American

7  Jurisprudence article.  I can provide a copy of it to the

8  court.

9     (Pause in Proceedings.)

10       THE COURT:  All these cites are state law cases

11  mainly out of New York.  I mean, I guess the starting point

12  would be the statute in terms of analyzing her argument.

13       MS. ROSEN-EVANS:  Your Honor, just for the record,

14  we did agree to the order.  I wrote the order up with

15  Mr. Zloch.  But I am not -- I do not concede that I waived

16  the argument.

17       THE COURT:  Well, and is it based on the statute?

18  It's pretty clear to me just reading the provisions of my

19  order that if you mail, distribute, or transmit threatening

20  communications, you would be in violation of it.

21       MS. ROSEN-EVANS:  Okay.  Let me just read the

22  statute.  And this is where I'm coming from, your Honor.  It

23  would be 18 4243(g).  Revocation of conditional --

24       THE COURT:  Wait a second.  Is it --

25       MS. ROSEN-EVANS:  It's Page 1254 in the newest code

1    book.

2              THE COURT:  18 what?

3              MS. ROSEN-EVANS:  18 4243(g).

4              "The Court shall, after a hearing, determine

5    whether the person should be remanded to a suitable facility

6    on the ground that in light of his failure to comply with

7    this prescribed regiment of medical, psychiatric, or

8    psychological care or treatment his continued release would

9    create a substantial risk of bodily injury to another person

10   or serious damage to property of another."

11             And in the cases that I have looked at, your Honor,

12   they all seem to phrase the finding of commitment, and most

13   of them do find the person to be committable, in that

14   language.  So, I would just argue, your Honor, that in order

15   to do that, to find Mr. Crape in violation, you would have to

16   do two things.  First, you would have to find that that

17   condition was part of the treatment regiment, the condition

18   not to write the letters.  Secondly, you would have to find

19   regardless of his mental state at the time he wrote the

20   letters that just the fact that he wrote the letters was

21   sufficient.  Almost like a strict liability type situation.

22             And I would argue that that would violate due

23   process in that when someone is unable to conform their

24   conduct because they cannot due to mental illness know that

25   their conduct is wrong, that -- I think that there's a long

1   history of recognizing the defense of insanity in every

2   jurisdiction, I think almost every jurisdiction in this

3   country.  And in other countries insanity is a recognized

4   defense.

5           THE COURT:  But the problem -- I mean, that's why

6   he ended up in the hospital in the first place.

7           MS. ROSEN-EVANS:  That's true, your Honor.

8           THE COURT:  He was not guilty by reason of

9   insanity.  So he was there until the doctors said he could be

10  released, and they thought he didn't present a danger.  I

11  agreed with certain conditions because I was -- one of the

12  main problems was whether he would be in a setting where he

13  could continue to take his medicine and where he wouldn't

14  continue to threaten people.  So he was released --

15          MS. ROSEN-EVANS:  Right.

16          THE COURT:  -- and then threatened people.  So --

17          MS. ROSEN-EVANS:  We agree that he did write the

18  letters, your Honor.  Yes.

19          THE COURT:  So what -- but you would argue that

20  that's not enough, that finding he violated -- that he

21  threatened people isn't enough, that I have to somehow find

22  he didn't comply with the regiment, prescribed regiment of

23  care.

24          MS. ROSEN-EVANS:  That's the first argument.  The

25  second argument is even if you find that his conduct did

1   violate the prescribed regiment of care, that's --

2          THE COURT:  What happens if the prescribed regiment

3   of care was inadequate?

4          MS. ROSEN-EVANS:  I think that's a separate issue.

5   I think then you probably can make a determination if the

6   conditions change that the regiment of care -- not that he

7   violated, but that the regiment of care may not have been

8   sufficient.  But I think that that is a separate issue.

9          MR. ZLOCH:  Judge, if I can interject.  One of the

10  things that I included in my response to Ms. Rosen-Evans'

11  motion was that Mr. Crape when he was sent back to be

12  evaluated for competency/insanity at the time of the letter

13  writing offense, if you will, he was interviewed by Dr. Rudy

14  Bugas.  And Dr. Bugas' report was attached both to my

15  pleading as well as the pleading filed jointly by the parties

16  outlining the procedural history of this case.

17         What I would like to draw the Court's attention to

18  is Mr. Crape indicated to Dr. Bugas that his copayments for

19  the medications were expensive and he could not manage to

20  live off his remaining Social Security disability income.  He

21  began to discontinue taking the medications -- or, excuse me,

22  taking some of the medications and his mental state began to

23  decompensate.

24         It goes on in Dr. Bugas' report that he offered an

25  illogical rationalization for sending the Palm Beach County

1   Sheriff's Office threatening letters to seek revenge and

2   because of his mistreatment by other residents at the

3   assisted living facility.

4            Your Honor, just so the record is clear, I have

5   with me today representatives both from the Oakwood Center

6   and the Golden Years Assisted Living Facility.  If they're

7   called to testify, I would proffer to the Court that they

8   would testify that Mr. Crape was always provided his

9   medication.  It was further explained to me that Mr. Crape

10  would have his medicine ordered by the -- just one minute.

11      (Pause in Proceedings.)

12           MR. ZLOCH:  Your Honor, Mr. Crape's medicine was

13  ordered at the Oakwood Center.  Oakwood Center would then

14  send that medicine to the Golden Years Assisted Living

15  Facility where staff at that facility would actually make

16  sure the right amount of medicine was pulled out of the

17  container and it was given to Mr. Crape.  It was given to

18  Mr. Crape in the sense that it was handed to him and

19  Mr. Crape would administer the medicine himself with the

20  exception of shots that were also given to him.

21           It has been further explained to me that there was

22  never any checkup that Mr. Crape actually swallowed the

23  pills, if you will.  In other words, they never asked

24  Mr. Crape please open your mouth, let's make sure that you

25  swallowed the medicine.  But I think it's important to point

1    out to the Court that Mr. Crape was never denied his

2    medications during the time period that he was under

3    conditional release and receiving treatment at the Golden

4    Years Assisted Living Facility and the Oakwood Center.

5              THE COURT:  Isn't that inconsistent with what he

6    told Bugas?

7              MR. ZLOCH:  Yes.

8              THE COURT:  He started telling me that he didn't

9    have enough money to pay for it.

10             MR. ZLOCH:  That is inconsistent what he told

11   Dr. Bugas.  And so it kind of dovetails into

12   Ms. Rosen-Evans's argument, your Honor, that for this Court

13   to find that Mr. Crape violated his conditional release this

14   Court would have to only be able -- can only use the statute,

15   the medical regiment language in the statute.  That's not the

16   Government's position.  But, alternatively, if this Court

17   only wants to rely on the statute in determining whether or

18   not to revoke Mr. Crape's release, we would submit that by

19   his own admission Mr. Crape has admitted to not taking the

20   medical regiment as required.

21             MS. ROSEN-EVANS:  Your Honor, I would just argue

22   that that information is totally unreliable.  If you read the

23   report that Dr. Bugas gave at the time Mr. Crape said this

24   statement, Mr. Crape was basically -- I think Dr. Bugas said

25   was openly psychotic.  So I would say that that's unreliable

1   hearsay.  Although, obviously, hearsay is allowable in a

2   hearing such as this, I would argue to the Court that to use

3   that to make a determination that it's been proven that

4   Mr. Crape did not take his medications would be

5   inappropriate.

6           THE COURT:  Well, it's an interesting argument you

7   make.  I mean, the statute doesn't -- when you read (g) it

8   doesn't -- it says, the director of a medical facility

9   responsible for administering a regiment imposed by on an

10  acquitted person conditionally discharged shall notify the

11  Attorney General and Court having jurisdiction over any

12  failure of the person to comply with the regiment, and upon

13  such notice then the person may be arrested and brought

14  before the Court and the Court shall determine whether the

15  person should be remanded to a suitable facility on the

16  ground that in light of his failure to comply with the

17  prescribed regiment of medical, psychiatric, or psychological

18  care or treatment his continued release would create a

19  substantial risk of bodily injury to another person or

20  serious damage to property of another.

21           That's not how this came before the Court.

22  Basically, he sent the letter to the sheriff threatening

23  people and was arrested, and that's what started this.  It

24  wasn't something about the director complaining that he

25  wasn't following the regiment of treatment, which is what the

```
1    statute seems to contemplate, but it was where he was accused

2    of violating the law and, fortunately, here only making a

3    threat as opposed to acting on it.  So while I see there's a

4    statutory basis for your argument, I'm not sure it totally

5    supplants the requirements of conditional release.

6         I didn't agree with what the doctor said initially,

7    that he could just be turned loose in the community without

8    some structure, without some guarantee he would keep taking

9    medicine because they said if he didn't take the medicine, he

10   would be back to where he was when they started dealing with

11   him.  And I thought there was very little chance under those

12   circumstances that he could -- that either he could succeed

13   or that he was not a danger to others.  So that was the

14   reason for the conditions.

15        MR. ZLOCH:  I think it's important to note, Judge,

16   that at the time Mr. Crape authored this threatening letter

17   he was under conditional release.  And just to make the

18   record complete, I'm going to have these gentlemen introduce

19   themselves and state where they're employed.

20        THE COURT:  Well, if you're going to put -- that's

21   why I started asking what you were planning to do in terms of

22   witnesses.  If you need a record, let's go ahead and have

23   them testify and establish the record.

24        MR. ZLOCH:  Yes, Judge.

25        THE COURT:  I don't think these legal issues alone
```

1    are going to solve it.

2              MR. ZLOCH:  All right.

3              THE COURT:  I can understand Ms. Rosen-Evans's

4    argument.  I have a hard time thinking that the only way his

5    conditional release can be revoked is if he didn't follow the

6    doctors' instructions.  It seems to me that overlooks the

7    possibility that the instructions themselves weren't adequate

8    or that they just -- the medicines just didn't work.

9              MS. ROSEN-EVANS:  Well, then that's -- you can make

10   that finding also, Judge.  I mean -- but I'm going based on

11   what is in front of me which is the petition.

12             THE COURT:  Well, the petition is he -- the result

13   of whatever happened, isn't it?  That he threatened people.

14             MS. ROSEN-EVANS:  Well, the petition is a result of

15   the fact that he got arrested for the conduct which we all

16   agree occurred.  But that's the vehicle that brings us here.

17             THE COURT:  All right.  Go ahead, Mr. Zloch.

18             MR. ZLOCH:  Judge, these gentlemen have expressed

19   some concern to me, and I've explained to them that Mr. Crape

20   through his attorney has placed his mental at issue;

21   therefore, there is no expectation of Mr. Crape to have his

22   medical treatment protected under any sort of privacy.

23   However, these gentlemen have asked me for the Court to rule

24   on that issue before they testify.

25             THE COURT:  Is there an issue on that?

1          MS. ROSEN-EVANS:  Well, Mr. Crape has not waived

2     the release of those records.

3          MR. ZLOCH:  We're not going to be introducing

4     records.  Just testimony, your Honor.

5          MS. ROSEN-EVANS:  I think that's the same thing.  I

6     think that they're concerned about -- I don't know if it's

7     HIPAA.  Is that what you're concerned about?  And I don't

8     know that a Court order overcomes the HIPAA rules.  I was not

9     prepared.  I didn't think we were going to have any testimony

10    here today, so I did not discuss that with Mr. Crape.

11         THE COURT:  Okay.  So on behalf of Mr. Crape you

12    object to their testimony as to whether or not he followed

13    the prescribed regiment?

14         MS. ROSEN-EVANS:  Well, I don't know what -- I

15    don't know what they're going to say, your Honor, so I'm

16    really in no position to --

17         MR. ZLOCH:  I can tell you right now, your Honor --

18    this may help Ms. Rosen-Evans to talk to her client.  Each

19    witness would be called to testify about the facility they

20    work at, what their facility does in terms of treatment, how

21    medicines are dispersed to patients being treated at the

22    facility, did they supervise or their facility supervise

23    Mr. Crape, how do they supervise him, and what medicine did

24    they provide to him, and did there ever come a time when

25    Mr. Crape's medicines were not given to him.

1        MS. ROSEN-EVANS:  I don't think that there's a

2   problem with that, but let me see if I can explain this to

3   Mr. Crape, your Honor.

4      (Defendant and counsel conferring sotto voce.)

5        MS. ROSEN-EVANS:  Your Honor, Mr. Crape -- I've

6   explained it to Mr. Crape.  He indicates to me he will not

7   waive the HIPAA privacy.

8        Now, the Court can go ahead and make a

9   determination that you have the power to overrule that.

10        THE COURT:  I don't know if I do or not.

11        MS. ROSEN-EVANS:  I don't know.

12        THE COURT:  Without lawyers presenting argument to

13   me on it one way or the other, I'm not in a position to rule.

14        MR. ZLOCH:  If Mr. Crape's not prepared to waive

15   that issue, I simply would rely on my earlier argument.  I

16   think the case law that I have cited does not require that

17   Mr. Crape's violation of his conditional release have an

18   element of volition.  I think that Mr. Crape has clearly

19   violated the order of conditional release, specifically the

20   condition that he not mail or communicate any threatening

21   communications.

22        The whole issue -- and the statute really focuses

23   on the issue of whether the defendant's continued conditional

24   release would create a substantial risk of danger to person

25   or property.  It's the Government's view that Mr. Crape's

1    threatening letter when considered with his prior conduct as

2    well as his decision to stop taking some of his medications

3    demonstrate that there is no regiment of medical and

4    psychiatric care that can assure the defendant's continued

5    conditional release would not create a substantial risk of

6    danger to person or property and wherefore we're moving this

7    Court to revoke his conditional release and commit him to the

8    custody of the Attorney General.

9              THE COURT:  All right.  Thank you.

10             Ms. Rosen-Evans, what presentation, if any, do you

11   want to make?

12             MS. ROSEN-EVANS:  Just argument, your Honor.  And I

13   have already given the Court most or all of my argument, but

14   I'll just briefly for the record just sum it up.

15             The first issue is whether or not the language of

16   the petition itself is sufficient to allege a failure to

17   comply with the prescribed treatment regiment as required by

18   18 USC 4243.  It is the defendant's position that that

19   allegation is what triggers the Court's authority to recommit

20   the person.  So that's the first argument.

21             Then, your Honor, the second argument is even if

22   the Court finds that the language in the petition is

23   sufficient to trigger the violation mechanism in 4243(g),

24   that there has been insufficient evidence to establish that

25   Mr. Crape failed to comply with the treatment regiment or

1     that his behavior was a result of failure -- of failing to

2     comply with the treatment regiment.  There is no evidence

3     presented to the Court that Mr. Crape did not take his

4     medication.  The statement by -- attributed to Mr. Crape in

5     Dr. Bugas' report I would argue is unreliable based upon

6     Mr. Crape's mental condition at the time the statement was

7     made.  He was incompetent at the time he made the statement.

8     According to Dr. Bugas' report I think he was psychotic.  So

9     I would argue that there is insufficient evidence placed

10    before the Court to establish that Mr. Crape failed to comply

11    with the treatment regiment.

12            Then if the Court finds that the petition is valid

13    and there is sufficient evidence -- well, if you find that

14    there's sufficient evidence to -- if you fund there's

15    sufficient evidence to conclude that he failed to comply with

16    the treatment regiment as to his medication, I think that

17    ends that part of the inquiry.  But if you find there is

18    insufficient evidence to establish that he wasn't fully

19    complying with the medication but that the allegations in the

20    petition are connected to the treatment regiment, then I

21    would argue that his mental state at the time that the

22    letters were written should be a defense to the accusation

23    that he violated the terms of his supervised release in that

24    he was insane at the time the letters were written which

25    means he was unable to appreciate the wrongfulness of his

1   conduct based upon a mental illness and that there is a rich

2   history in our law that mental illness or insanity at the

3   time of the offense is a defense.  So I would argue that the

4   violation, if the Court finds that there was one, was not

5   willful.

6           Lastly, if you find after all of that that

7   Mr. Crape did violate the conditions of his conditional

8   release, then I think the Court needs to go to step two which

9   would be whether or not his continued release would create a

10  substantial risk of bodily injury to another person or

11  serious damage to property of another.  And I would argue to

12  the Court that Mr. Crape has been in custody for close to two

13  years now.  He is medically compliant.  He is competent.  And

14  I would argue that there are conditions which the Court could

15  impose which would insure the safety of the community and the

16  property of the community.  He could go back into an ALF and

17  be monitored just as he was monitored before.

18          Because, Judge, remember that if you commit him, it

19  is not an indefinite commitment.  You have the obligation

20  to -- or the Attorney General has the obligation to within a

21  year -- I believe they're doing these risk assessments now

22  once a year.  Within a year he's supposed to be brought back

23  before a risk assessment panel to determine whether he can be

24  released.  And I think we're going to be very much -- if he's

25  medically compliant like he is now, I think we're going to be

1  in the same exact position we were in before.  They're going

2  to -- wherever he goes, Deven, Butner, wherever is going to

3  say he's ready, he's ready to be released on conditions, and

4  there we are.  We are going to be in the exact same position.

5  And I don't think that the Court can set a bar that's

6  impossible for Mr. Crape to make.

7          In other words, there's going to come a time when

8  this Court is really going to have release Mr. Crape and,

9  yes, none of us can predict the future and none of us want to

10 think that Mr. Crape is ever going to do anything bad like we

11 don't want to think anybody that you release is going to do

12 something bad, but you can't keep somebody in custody

13 indefinitely because you fear that sometime in the future

14 something may happen.  I think you are going to have to deal

15 with releasing Mr. Crape whether it's now or whether it's six

16 months from now or six months after that.  I think there's

17 going to come a time when you are going to have to do that.

18         THE COURT:  Well, I did that before.  I don't have

19 a problem with that.  I released him before, as you recall,

20 under conditions.  I guess I really question whether all --

21 whether some of the steps that are underway really help

22 Mr. Crape get released.

23         I know you're representing your client and you have

24 to do what you feel is in the best interest of your client,

25 but it seems like we get twisted up in procedure as opposed

1    to trying to ever find a way where Mr. Crape could live in

2    the community, which is how a lot of this started.

3             MS. ROSEN-EVANS:  Well, we --

4             THE COURT:  I was not at all hostile to the idea of

5    Mr. Crape, assuming he can take his medicine and not threaten

6    people, living in the community.  That's what the point of

7    the order was.

8             MS. ROSEN-EVANS:  Well, I wish that the State of

9    Florida would have agreed to take Mr. Crape.  That would have

10   also I think been a good resolution, but they refused.  So

11   this is where we find ourselves, your Honor.

12            THE COURT:  Okay.

13            MR. ZLOCH:  I was just going to point out, your

14   Honor, I don't see anywhere in the statute that we've been

15   talking about where there is a time period in order for the

16   director of the facility where Mr. Crape is committed to

17   notify the Court that Mr. Crape is ready to be discharged or

18   released.  So, if there's any -- if this Court is going to

19   order that Mr. Crape be committed to the custody of the

20   Attorney General, I would ask this Court not to impose any

21   time limitation on the BOP when making that determination if,

22   in fact, it ever comes to be -- if it ever becomes ripe.

23            THE COURT:  All right.  Mr. Crape, would you like

24   to speak, sir?  You're not required to.  But if you would

25   like to say something, I want to make sure you have the

1    opportunity.

2            THE DEFENDANT:  No.

3            THE COURT:  All right.  Well, I've considered the

4    petition, the position of the parties, certainly the legal

5    argument.  It is not questioned that Mr. Crape did write the

6    letters to the sheriff threatening basically harm to others

7    which was a violation of one of the conditions of his

8    release, that he not mail, distribute, or transmit any

9    threatening communications.  There is -- he apparently made a

10   statement after his arrest to the medical personnel saying

11   that he had not taken his medications.  I'm not clear that

12   that's what happened given his mental state at the time he's

13   alleged to have made the statement.

14           The Government has brought witnesses from the

15   facilities where he was spending his time and concerning

16   whether or not he was following the regiment of care and

17   whether he was taking the medicine and whether he was being

18   given the medicine.  Mr. Crape has asserted privacy rights

19   and has objected to that testimony, so it is unclear to me

20   whether the cause for his -- whether the medicine wasn't

21   adequate, whether he didn't take it, or whether the regiment

22   of care was simply inadequate to the requirements is not

23   clear to me.  But what is clear is that for whatever reason

24   he continued to mail threatening communications threatening

25   to kill people.

1          One of the factors that led to my initial release

2    of Mr. Crape was the doctor's opinion that his mental state

3    was unstructured so they didn't think that he would be able

4    to put together the organization to travel to Washington to

5    kill the president or members of the president's family.

6    However, his latest threats are to the Sheriff of Palm Beach

7    County, substantially closer, and I on this record am not

8    prepared to say that he does not present a danger to others.

9    I think he does.  He has threatened bodily harm to others,

10   and I am assuming that he's prepared to act on it.

11          The medical staff has said he's competent to

12   participate in this hearing, but there's also the opinion of

13   doctors that he was -- at the time he wrote the letters was

14   insane, and I accept that finding.  But I do feel that he

15   constitutes a danger to others and that he has violated the

16   terms and conditions of his release, and so I revoke the

17   conditional release and commit the defendant to the Attorney

18   General for treatment pursuant to the act.

19          Anything else need to be done, Mr. Zloch?

20          MR. ZLOCH:  Your Honor, I have a proposed order.

21   If you would like me to pass it up?

22          THE COURT:  All right.

23      (Pause in Proceedings.)

24          MS. ROSEN-EVANS:  Your Honor, I'm not going to be

25   in agreement with that order based upon my position here

```
1    today, but I understand the Court's ruling.

2         (Pause in Proceedings.)

3              THE COURT:  All right.  The order I think is

4    consistent with my ruling today so I have signed the order.

5              Okay.  Anything else today?

6              MR. ZLOCH:  No, your Honor.

7              MS. ROSEN-EVANS:  No, your Honor.  Thank you.

8              THE COURT:  Good luck to you, Mr. Crape.

9         (Proceedings concluded at 2:18 p.m.)

10

11              *     *     *     *     *

12

13                   C E R T I F I C A T E

14       I, Karl Shires, Registered Professional Reporter, certify

15   that the foregoing is a correct transcript from the record of

16   proceedings in the above-entitled matter.

17       Dated this 20th day of May, 2009.

18

19   Karl Shires, RPR

20

21

22

23

24

25
```